

# NUMBER 13-17-00279-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

CLAUDIO ALBERTO MORALES,                                    Appellant,

v.

THE STATE OF TEXAS,                                              Appellee.

## On appeal from the 275th District Court
## of Hidalgo County, Texas.

# MEMORANDUM OPINION

### Before Justices Rodriguez, Longoria, and Hinojosa
### Memorandum Opinion by Justice Hinojosa

Appellant Claudio Alberto Morales appeals his conviction for murder, a first-degree felony. *See* TEX. PENAL CODE ANN. § 19.02 (West, Westlaw through 2017 1st C.S.). A jury found appellant guilty, and the trial court sentenced appellant to life imprisonment in the Texas Department of Criminal Justice-Institutional Division. By six issues, which we have reordered, appellant argues that: (1) the evidence supporting his conviction is

legally insufficient; the trial court erred in overruling appellant's objections to (2) impermissible character evidence and (3) physical evidence for which the chain-of-custody was not established; (4) his right to confront witnesses was violated; (5) appellant's trial counsel was ineffective; and (6) the cumulative harm from trial court error entitles appellant to a new trial. We affirm.

## I.    BACKGROUND

This "cold case" prosecution involves the 2005 murder of Arturo Noe Sanchez. Sanchez's body was discovered in the bedroom of his home after he suffered a lethal stab wound to his neck. Law enforcement determined that DNA recovered from underwear next to Sanchez's bed was attributable to an unknown male. However, the DNA could not be matched to a suspect, and the case went cold. Appellant was not a suspect until 2010, when his DNA profile was entered into the CODIS[1] database and it proved to be a match to the DNA recovered from the 2005 crime scene. Further investigation lead to appellant's arrest. A grand jury returned an indictment alleging that appellant committed capital murder by intentionally causing the death of Sanchez by stabbing him with a knife and doing so while in the course of committing or attempting to commit the offense of robbery. The case proceeded to trial, at which the following evidence was adduced.

### A.    Initial Investigation

Sanchez lived alone in his home in McAllen, Texas. On December 19, 2005,

---

[1] CODIS refers to the Combined DNA Index System that is jointly maintained by the Federal Bureau of Investigation and various state and local agencies. TEX. GOV'T CODE ANN. § 411.141(1) (West, Westlaw through 2017 1st C.S.); *Villarreal v. State*, 255 S.W.3d 205, 207 (Tex. App.—Waco 2008, no pet.).

Elida Gonzalez, a friend of Sanchez, became concerned because Sanchez was not answering his phone. Elida had seen Sanchez the day before, and she wanted to invite him to breakfast. Eventually, Ismael Gonzalez, Elida's father-in-law, answered Sanchez's phone. Ismael, who helped Sanchez with various household chores, told Elida that Sanchez appeared to be asleep in his bedroom. Elida remained worried, so she went with her sister Norma Lopez to Sanchez's house. Ismael waited for them outside. When Elida entered the residence, she noticed that Sanchez's bedroom door was partially ajar. Elida opened the door fully and saw Sanchez laying on the bed in a pool of blood. He was nude from the waist down. Sanchez's bedroom appeared to have been ransacked, and his vehicle was missing. Lopez called 911.

Fulgencio Salinas, M.D., the physician who performed the autopsy, testified that Sanchez died from a stab wound underneath his jawbone. The wound was three-and-a-half inches deep, penetrating the jugular vein and the spinal column. Dr. Salinas testified that Sanchez suffered a separate, non-lethal stab wound near his upper eyelid.

McAllen police officers responded to the residence, where they interviewed Ismael, Elida, and Lopez. Armando Hernandez, a crime scene investigator, testified that a bloody knife was found on Sanchez's bed. He also observed a pair of men's underwear on the floor next to the bad. "Specs" of fresh blood were visible on the underwear. Investigator Hernandez collected the underwear and placed it in an evidence bag. An empty money bag was also recovered from the residence. The underwear and other collected items were sent to the Texas Department of Public Safety (DPS) lab for DNA testing.

3

Alejandro Madrigal Jr., a forensic analyst for DPS, processed cuttings containing blood stains from the underwear and developed a DNA profile. Madrigal testified that the DNA profile was consistent with an unknown male. The profile was entered into the CODIS database, but no match was returned. Madrigal identified DNA from two unknown individuals from a towel found in Sanchez's car, but the sample did not yield a full DNA profile.

Steve Ayala, a McAllen police officer, was the lead investigator assigned to the case. Officer Ayala testified that Sanchez's car was discovered in front of a nearby business. No useable prints were recovered from the vehicle. Officer Ayala examined Sanchez's phone and identified three suspicious incoming phone calls. Separate calls were placed from payphones at two nearby gas stations, a Circle K and a Valley Shamrock. The third call was traced to a laundromat payphone. The first two calls were made the night of Sanchez's death, and the third was placed the next morning. Officers dusted the payphones for finger prints but were unable to obtain a useable print. Officer Ayala learned from his investigation that Sanchez kept a substantial amount of cash in a money bag at his home.

According to Officer Ayala, the McAllen police department investigated several possible suspects, but they were eliminated when their DNA profiles did not match the DNA from the crime scene. Ismael, in particular, was brought to the station for questioning. Officers recovered his personal belongings and took his fingerprints. A shoeprint from Sanchez's vehicle did not match Ismael's shoes. Neither Ismael's DNA

nor his fingerprints were found on any of the collected evidence, and he was ruled out as a suspect.

Officer Ayala learned from Sanchez's friend Randy Ramirez that Sanchez would contact men through a dating website and invite them to his home. Sanchez's home computer was seized and examined, but its contents did not provide any investigative leads. The police concluded their investigation in early 2007 without making an arrest. The case remained cold for almost four years.

## B. DNA Lead

In late 2010, Officer Ayala was notified that a DNA profile entered into the CODIS database matched the DNA profile recovered from the underwear found at the crime scene. The contributor was identified as appellant. Officer Ayala obtained a driver's license photograph of appellant. He then reviewed surveillance footage from the Valley Shamrock on the night of Sanchez's murder and identified appellant entering the store at 6:05 and 6:09 p.m. Appellant's presence at the store coincided with a phone call placed to Sanchez's phone from the store's payphone later that evening. Officer Ayala also learned that at the time of the murder, appellant lived nearby in Mission, Texas. The third phone call placed to Sanchez's phone was from a local laundromat located "a few blocks away" from appellant's then-residence.

After briefing his supervisors on the latest developments, Officer Ayala secured a warrant for appellant's arrest. The police were initially unable to locate appellant, and he was not arrested until May of 2014. At that time, Officer Ayala obtained a saliva sample from appellant and submitted it to the DPS lab for testing.

5

Vanessa Nelson, a forensic analyst for DPS, testified that she performed testing on the sample taken from appellant. Nelson developed a DNA profile and compared it to the profile previously developed from the underwear. Nelson concluded that the DNA from the underwear belonged to appellant. Nelson explained that, except for identical twins, every person has a unique DNA profile.

## C. Jury Verdict and Sentence

The jury was asked to find whether appellant was guilty of capital murder or the lesser included offenses of murder or robbery. The jury found appellant guilty of murder. Following a punishment hearing, the trial court sentenced appellant to life imprisonment. After conducting a hearing, the trial court denied appellant's motion for new trial. This appeal followed.

## II. LEGAL SUFFICIENCY

By his first issue, appellant argues that the evidence supporting his conviction is legally insufficient.

## A. Standard of Review and Applicable Law

Every criminal conviction must be supported by legally sufficient evidence as to each element of the offense that the State is required to prove beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 315 (1979); *Adames v. State*, 353 S.W.3d 854, 859 (Tex. Crim. App. 2011). In a legal sufficiency review we consider the evidence in the light most favorable to the verdict, and we decide whether a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Brooks v. State*, 323 S.W.3d 893, 902 (Tex. Crim. App. 2010) (plurality

op.). The fact-finder is the exclusive judge of the credibility of witnesses and of the weight to be given to their testimony. *Brooks*, 323 S.W.3d at 899; *Lancon v. State*, 253 S.W.3d 699, 707 (Tex. Crim. App. 2008). Reconciliation of conflicts in the evidence is within the fact-finder's exclusive province. *Wyatt v. State*, 23 S.W.3d 18, 30 (Tex. Crim. App. 2000). We resolve any inconsistencies in the testimony in favor of the verdict. *Bynum v. State*, 767 S.W.2d 769, 776 (Tex. Crim. App. 1989).

We measure the sufficiency of the evidence by the elements of the offense as defined by a hypothetically correct jury charge. *Cada v. State*, 334 S.W.3d 766, 773 (Tex. Crim. App. 2011) (citing *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)). Such a charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. *Id*. Under a hypothetically correct jury charge, the State was required to prove beyond a reasonable doubt that appellant intentionally or knowingly caused the death of Sanchez. *See* TEX. PENAL CODE ANN. § 19.02(b)(1).

## B.     Analysis

Appellant argues that the evidence is legally insufficient because "the only evidence linking [a]ppellant to the murder was the forensic comparisons of the blood recovered from the underwear . . . and a followup [sic] saliva swab." Appellant maintains that such evidence is "circumstantial and insufficient to support a conviction." Appellant posits that the evidence does not foreclose the possibility that he encountered Sanchez the night of his death "prior to his assailant's arrival later that evening."

7

The State must prove beyond a reasonable doubt that the accused is the person who committed the charged offense. *See Miller v. State*, 667 S.W.2d 773, 775 (Tex. Crim. App. 1984); *Kromah v. State*, 283 S.W.3d 47, 50 (Tex. App.—Houston [14th Dist.] 2009, pet. ref'd); *Roberson v. State*, 16 S.W.3d 156, 167 (Tex. App.—Austin 2000, pet. ref'd). "When there is no direct evidence of the perpetrator's identity elicited from trial witnesses, no formalized procedure is required for the State to prove the identity of the accused." *Roberson*, 16 S.W.3d at 167 (citing *Sepulveda v. State*, 729 S.W.2d 954, 957 (Tex. App.—Corpus Christi 1987, pet. ref'd)). The State may prove a defendant's identity by circumstantial evidence, coupled with all reasonable inferences from that evidence. *Jenkins v. State*, 493 S.W.3d 583, 599 (Tex. Crim. App. 2016); *see Earls v. State*, 707 S.W.2d 82, 85 (Tex. Crim. App. 1986) (identity may be proved by direct or circumstantial evidence*); see also Allen v. State*, No. 05-11-00056-CR, 2012 WL 2106530, at *2 (Tex. App.—Dallas June 12, 2012, pet. ref'd) (op., not designated for publication) (explaining that "a conviction can be sustained on the testimony of a DNA expert, which establishes identity beyond a reasonable doubt"); *Caldwell v. State*, No. 14-08-01019-CR, 2010 WL 1655471, at *6 (Tex. App.—Houston [14th Dist.] Apr. 27, 2010, pet. ref'd) (mem. op., not designated for publication) ("DNA evidence coupled with reasonable inferences drawn from circumstantial evidence will support a conviction.").

Appellant argues that the presence of his DNA standing alone establishes only that appellant was at the crime scene at some point, but that it does not constitute evidence that appellant was the individual who stabbed Sanchez. However, appellant's argument ignores the particular circumstances surrounding the location of the DNA and

the type of substance from which appellant's DNA was identified—that being fresh drops of blood on a pair of underwear laying near Sanchez's body. The nature of such evidence places appellant in close physical and temporal proximity to the murder. Appellant's proximity to the murder is further supported by evidence that appellant placed a call to Sanchez's phone from a nearby gas station on the night of the murder. The jury could have reasonably inferred from this evidence that appellant's blood was deposited during the lethal encounter with Sanchez. Separately from establishing appellant's presence at the crime scene, the DNA constitutes circumstantial evidence that supports an inference that appellant was the person who stabbed Sanchez. *See Clayton v. State*, 235 S.W.3d 772, 779 (Tex. Crim. App. 2007) (explaining that the presence of the defendant's bloody finger prints constituted circumstantial evidence that the appellant shot the murder victim).

Appellant also suggests that the evidence is insufficient because the State's circumstantial evidence does not foreclose the possibility that another individual might have stabbed Sanchez after appellant's departure. To the extent that appellant urges us to consider alternative hypotheses to explain the incriminating evidence, we observe that the Texas Court of Criminal Appeals has long abandoned this construct when reviewing the sufficiency of circumstantial evidence. *See Sonnier v. State*, 913 S.W.2d 511, 516 (Tex. Crim. App. 1995) (citing *Geesa v. State*, 820 S.W.2d 154 (Tex. Crim. App. 1991)).

We conclude that a rational trier of fact could have found beyond a reasonable doubt that appellant was the person who caused Sanchez's death. *See Jackson*, 443 U.S. at 319; *Brooks*, 323 S.W.3d at 902. We overrule appellant's first issue.

9

### III.   EVIDENTIARY RULINGS

By his second and third issues, appellant argues that the trial court abused its discretion in overruling his evidentiary objections.

### A.   Standard of Review

We review a trial court's ruling on evidentiary matters under an abuse of discretion standard.   *Billodeau v. State*, 277 S.W.3d 34, 39 (Tex. Crim. App. 2009).   A trial court abuses its discretion if its action is arbitrary or unreasonable.   *State v. Mechler*, 153 S.W.3d 435, 439 (Tex. Crim. App. 2005).   We consider the trial court's ruling in light of what was before it at the time the ruling was made and uphold the ruling if it lies within the zone of reasonable disagreement.   *Billodeau*, 277 S.W.3d at 39.   We will uphold the trial court's ruling if it is correct under any theory of law applicable to the case.   *Bowley v. State*, 310 S.W.3d 431, 434 (Tex. Crim. App. 2010).

### B.   CODIS

By his second issue, appellant argues that the trial court abused its discretion in overruling his objection to testimony referencing the CODIS database.   Specifically, appellant maintains that such references constituted extraneous offense evidence in violation of Texas Rule of Evidence 404(b).[2]   *See* TEX. R. EVID. 404(b) ("Crimes, Wrongs, or Other Acts").

---

[2] Appellant also argues on appeal that evidence concerning the CODIS database violated Texas Rule of Evidence 403.   However, that objection was not lodged in the trial court; therefore, it is not preserved for appeal.   *See* TEX. R. APP. P. 33.1(a).

### 1. Applicable Law

Evidence of a defendant's crime, wrong, or other act is not admissible to prove the defendant's character in order to show that he acted in conformity with that character. *Id*. R. 404(b)(1). However, evidence of such prior bad acts may be admissible if it has relevance apart from its tendency to prove character conformity. *Id*. R. 404(b)(2). If evidence of an extraneous offense is not relevant apart from supporting an inference of character conformity, it is absolutely inadmissible under Rule 404(b). *Gonzalez v. State*, 544 S.W.3d 363, 371 (Tex. Crim. App. 2018).

### 2. Analysis

The trial court permitted the State to introduce, over appellant's objection, evidence that appellant was identified as a suspect through the CODIS database. However, the trial court ruled that the State could not present evidence concerning any extraneous offense which led to appellant's DNA being collected. Neither could the State offer any testimony describing the CODIS database. After the trial court's initial ruling, appellant made no further objection to testimony referencing the CODIS database.

"[T]o constitute an improper reference to an extraneous offense, 'the evidence must show a crime or bad act, and that the defendant was connected to it.'" *Holmes v. State*, 962 S.W.2d 663, 672 (Tex. App.—Waco 1998, pet. ref'd) (quoting *Lockhart v. State*, 847 S.W.2d 568, 573 (Tex. Crim. App. 1992)). We are unable to conclude that the mere reference to the CODIS database constitutes impermissible extraneous offense evidence. Such a reference does not identify a particular extraneous offense or prior bad act, and it does not explain appellant's connection to such an act. *See Holmes*, 962

11

S.W.2d at 672; *see also Mata v. State*, No. 05–05–00504–CR, 2007 WL 882439, at *5 (Tex. App.—Dallas Mar. 26, 2007, pet. ref'd) (op., not designated for publication) (concluding that evidence of the defendant's DNA profile in the CODIS database was not improper extraneous offense evidence).

We also observe that officers are generally permitted to testify as to how the investigation began and how the defendant became a suspect. *See Lee v. State*, 29 S.W.3d 570, 577 (Tex. App.—Dallas 2000, no pet.). Such permissible evidence might come in the form of a fingerprint card, *see Stephenson v. State*, 494 S.W.2d 900, 907 (Tex. Crim. App. 1973); *see also Mahan v. State*, No. 14-96-00407-CR, 1998 WL 30168, at *1 (Tex. App.—Houston [14th Dist.] Jan. 29, 1998, no pet.) (op., not designated for publication) ("It is well-established that evidence of a fingerprint record is not proof of a prior offense."), or, as here, a reference to a DNA database. *See Mata*, 2007 WL 882439, at *5.

We conclude that the trial court did not abuse its discretion in overruling appellant's Rule 404 objection. *See Billodeau*, 277 S.W.3d at 39. We overrule appellant's second issue.

## C. Chain of Custody

By his third issue, appellant argues the trial court abused its discretion in overruling his objection to the admissibility of the underwear found at the crime scene on the grounds that a proper chain of custody was not established.

### 1. Applicable Law

Texas Rule of Evidence 901 requires the authentication or identification of

evidence to establish that the matter in question is what the proponent claims it to be. TEX. R. EVID. 901. Articles that are easily identifiable and are substantially unchanged normally do not require the introduction of a chain of custody. *Hartsfield v. State*, 200 S.W.3d 813, 817–18 (Tex. App.—Texarkana 2006, pet. ref'd); *see Outland v. State*, 810 S.W.2d 474, 475 (Tex. App.—Fort Worth 1991, pet. ref'd) (concluding that a pistol seized from defendant's automobile and identified by officers together with no evidence of tampering was sufficient even though the pistol was not tagged when seized). If the item has distinct or unique characteristics, a witness may authenticate it by testifying that he or she has previously seen the item at the relevant time and place and that the witness recognizes it by its distinctive characteristics. *Hartsfield*, 200 S.W.3d at 818; *Mendoza v. State*, 69 S.W.3d 628, 631 (Tex. App.—Corpus Christi 2002, pet. ref'd).

For evidence lacking such distinct characteristics, the article is sufficiently authenticated when the State establishes "the beginning and the end of the chain of custody, particularly when the chain ends at a laboratory." *Martinez v. State*, 186 S.W.3d 59, 62 (Tex. App.—Houston [1st Dist.] 2005, pet. ref'd); *see Gallegos v. State*, 776 S.W.2d 312, 315–16 (Tex. App.—Houston [1st Dist.] 1989, no pet.). Furthermore, tagging an item of physical evidence at the time of its seizure and then identifying it at trial based upon the tag is sufficient to establish the proper chain of custody. *Lagrone v. State*, 942 S.W.2d 602, 617 (Tex. Crim. App. 1997); *Garcia v. State,* 537 S.W.2d 930, 934 (Tex. Crim. App. 1976). Absent evidence of fraud or tampering, alleged issues concerning gaps in the chain of custody affect the weight to be given the evidence and

13

not the admissibility of the evidence. *Druery v. State*, 225 S.W.3d 491, 503–04 (Tex. Crim. App. 2007); *Lagrone*, 942 S.W.2d at 617.

### 2.    Analysis

The State moved to admit into evidence State's exhibit number 73, described as "a pair of white men's underwear."   The trial court overruled appellant's objection that the State failed to establish a complete chain of custody.   At the time of the trial court's ruling, the State had presented two witnesses concerning the collection and maintenance of State's exhibit number 73.   Investigator Hernandez testified that he bagged the exhibit himself, wrote distinctive markings on the bag, and sent the items to DPS for testing.   He identified the distinctive markings at trial.   Monica Ballesteros, an evidence technician for the McAllen Police Department since 2010, also identified the exhibit.   She testified that the crime lab had custody of the item except when it was sent to the DPS lab for testing.

The State presented testimony that the exhibit was tagged at the time of its seizure, and the exhibit was identified at trial based upon its distinct tag.   In addition, the evidence established that the exhibit was stored at all times in either the crime lab or the DPS lab. This evidence is sufficient to establish the exhibit's authenticity.   *See Lagrone*, 942 S.W.2d at 617.   Appellant's argument to the contrary relies on the fact that Ballesteros was not employed as an evidence technician until 2010, long after the evidence was collected.   However, such an argument concerns only a gap in the chain of custody, which affects the weight to be given the evidence and not its admissibility.   *See Druery*, 225 S.W.3d at 503–04.

We conclude that the trial court did not abuse its discretion in overruling appellant's

14

objection to State's exhibit number 73. *See Billodeau*, 277 S.W.3d at 39. We overrule appellant's third issue.

## IV. CONFRONTATION CLAUSE

By his fourth issue, appellant argues that his right to confront witnesses was violated when the trial court permitted the State to introduce DNA lab reports through a witness who did not perform the underlying analysis. Particularly, appellant complains that lab reports prepared by analyst Madrigal were improperly introduced through analyst Nelson over appellant's objection.

### A. Standard of Review and Applicable Law

The Confrontation Clause of the Sixth Amendment guarantees the accused the right to confront the witnesses against him. U.S. CONST. amend. VI.; *see Pointer v. Texas*, 380 U.S. 400, 403 (1965); *Paredes v. State*, 462 S.W.3d 510, 514 (Tex. Crim. App. 2015). This right applies to "testimonial" statements, which are inadmissible at trial unless the witness who made them either takes the stand to be cross-examined or is unavailable and the defendant had a prior opportunity to cross-examine the witness. *Crawford v. Washington*, 541 U.S. 36, 54 (2004). Testimonial statements include those "that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Id*. at 52. Forensic laboratory reports prepared in connection with a criminal investigation or prosecution are generally considered testimonial statements subject to the Confrontation Clause. *Bullcoming v. New Mexico*, 544 U.S. 647, 658–59 (2011). Nevertheless, when the declarant appears for cross-examination at trial, the Confrontation Clause places no

15

constraints at all on the use of his prior testimonial statements. *Woodall v. State*, 336 S.W.3d 634, 642 (Tex. Crim. App. 2011) (citing *Crawford*, 541 U.S. at 59 n.9). We review de novo a trial court's constitutional legal ruling. *Wall v. State*, 184 S.W.3d 730, 742 (Tex. Crim. App. 2006).

**B.     Analysis**

As set out above, Madrigal initially tested the items recovered from the crime scene, developing a DNA profile from the blood-stained underwear. Years later, Nelson developed a DNA profile from appellant's saliva sample and compared it to the earlier profile developed by Madrigal. Madrigal was unavailable at the beginning of the trial because he was out of the country. The trial court permitted the State to introduce Madrigal's lab reports through Nelson upon the State's representation that Madrigal would later be called as a witness. This ultimately occurred. While the witnesses testified out of order, both were available at trial and subject to cross-examination concerning any testimonial statements contained in their respective reports. Accordingly, appellant was afforded the opportunity to cross-examine Madrigal concerning any of his conclusions. Because Madrigal was subject to cross-examination, appellant's right to confrontation was not violated. *See Crawford*, 541 U.S. at 59 n.9*; Woodall*, 336 S.W.3d at 642; *Sanchez v. State*, 269 S.W.3d 169, 171–72 (Tex. App.—Amarillo 2008, pet. ref'd); *Eustis v. State*, 191 S.W.3d 879, 886 (Tex. App.—Houston [14th Dist.] 2006, pet. ref'd); *Hanson v. State*, 180 S.W.3d 726, 731 (Tex. App.—Waco 2005, no pet.); *Moore v. State*, 169 S.W.3d 467, 470 n.8 (Tex. App.—Texarkana 2005, pet. ref'd).

Conducting a de novo review, we conclude that the trial court did not err in

16

overruling appellant's Confrontation Clause objection. *See Wall*, 184 S.W.3d at 742. We overrule appellant's fourth issue.

## V.  INEFFECTIVE ASSISTANCE OF COUNSEL

By his fifth issue, appellant argues that his trial counsel was ineffective "in failing to hire a consulting and testifying expert, for failing to investigate and offer an alternate predator defense and for failing to preserve error."

### A.  Standard of Review and Applicable Law

To prevail on an ineffective assistance claim, appellant must show (1) counsel's representation fell below an objective standard of reasonableness, and (2) the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 689 (1984); *Lopez v. State*, 343 S.W.3d 137, 142 (Tex. Crim. App. 2011). "Unless appellant can prove both prongs, an appellate court must not find counsel's representation to be ineffective." *Lopez*, 343 S.W.3d at 142. To satisfy the first prong, appellant must prove by a preponderance of the evidence that his counsel's performance fell below an objective standard of reasonableness under the prevailing professional norms. *Id.* To prove prejudice, appellant must show that there is a reasonable probability, or a probability sufficient to undermine confidence in the outcome, that the result of the proceeding would have been different. *Id.*

"In order for an appellate court to find that counsel was ineffective, counsel's deficiency must be affirmatively demonstrated in the trial record; the court must not engage in retrospective speculation." *Id*.; *see Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999) ("Any allegation of ineffectiveness must be firmly rooted in the

17

record[.]"). "It is not sufficient that appellant show, with the benefit of hindsight, that his counsel's actions or omissions during trial were merely of questionable competence." *Mata v. State*, 226 S.W.3d 425, 430 (Tex. Crim. App. 2007). When direct evidence is unavailable, we will assume counsel had a strategy "if any reasonably sound strategic motivation can be imagined." *Lopez*, 343 S.W.3d at 143.

Although an appellant may claim ineffective assistance of counsel for the first time on direct appeal, the record in such a case often will be insufficient to overcome the presumption that counsel's conduct was reasonable and professional. *Cannon v. State*, 252 S.W.3d 342, 349 (Tex. Crim. App. 2008); *Washington v. State*, 417 S.W.3d 713, 724 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd). The trial court held a hearing on appellant's motion for new trial, but appellant presented no evidence to support his allegations that his trial counsel was ineffective. Where there is no proper evidentiary record developed at a hearing on a motion for new trial, it is extremely difficult to show trial counsel's performance was deficient. *See Bone v. State*, 77 S.W.3d 828, 833 (Tex. Crim. App. 2002). Under this procedural posture, we will not find deficient performance unless counsel's conduct is so outrageous that no competent attorney would have engaged in it. *Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005); *Washington*, 417 S.W.3d at 724.

## B. DNA Expert

Appellant first argues that it was unreasonable for his trial counsel "to forgo a forensic expert in a murder trial where the key evidence is DNA[.]" Trial counsel's strategy in this regard, however, is clear from the record. *See Ex parte Gutierrez*, 337

S.W.3d 883, 896 (Tex. Crim. App. 2011) ("Although there is no explicit explanation from counsel why he did not ask for [DNA] testing, counsel's strategy became clear at trial."). Trial counsel sought not to disprove that appellant's DNA was found at the crime scene; rather, he chose to emphasize that there were plausible, innocent reasons for appellant to have been at Sanchez's home. Counsel stressed the absence of appellant's fingerprints or other DNA at the crime scene, including on the purported murder weapon. Appellant's counsel effectively cross-examined the State's witnesses to make the point that the DNA evidence by itself was not dispositive of appellant's guilt.

Further, trial counsel may have believed that additional DNA testimony would have simply confirmed the conclusions of the State's DNA expert. *See Hale v. State*, 220 S.W.3d 180, 183 (Tex. App.—Eastland 2007, no pet.); *Mincey v. State*, 112 S.W.3d 748, 752–53 (Tex. App.—Beaumont 2003, no pet.); *see also Skinner v. State*, 293 S.W.3d 196, 202–03 (Tex. Crim. App. 2009) (concluding that trial counsel was not ineffective for failing to hire expert to perform additional DNA testing where counsel explained "he was afraid the DNA would turn out to be [the defendant's]" and "would also have deprived the defense of its primary argument at trial that the government conducted a shoddy investigation"). We conclude that appellant has failed to rebut the presumption that counsel was acting according to sound trial strategy in deciding against securing a DNA expert. *See Lopez*, 343 S.W.3d at 143.

## C.     Alternative Perpetrator

Next, appellant argues that his trial counsel was ineffective for failing to investigate alternative suspects. However, appellant presented no evidence regarding what such

an investigation would have revealed. Accordingly, appellant has not established that but for his counsel's failure to investigate alternative suspects, the outcome of his trial would have been different. *See Cooks v. State*, 240 S.W.3d 906, 912 (Tex. Crim. App. 2007) (holding "conclusory allegation" that trial counsel failed to conduct an investigation did not demonstrate prejudice because no showing was made regarding what evidence a proper investigation would have revealed that "reasonably could have changed the result").

## D.    Failing to Preserve Error

Finally, appellant argues that "[s]hould any point of error within this brief be found to have been waived, [a]ppellant asserts that defense counsel was deficient in failing to properly object or otherwise preserve error of the same." This bare allegation is not supported by argument or authority. Therefore, we decline to address the assertion as it is inadequately briefed. *See* TEX. R. APP. P. 38.1(i) ("The brief must contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record.").

## E.    Summary

Appellant has failed to establish both prongs of *Strickland* concerning his ineffective-assistance-of-counsel claims. *See Lopez*, 343 S.W.3d at 142. Therefore, we overrule his fifth issue.

### VI.    CUMULATIVE HARM

By his sixth issue, appellant argues that he is entitled to a new trial due to the cumulative harm from trial court error. Multiple errors may be found to be harmful in their

cumulative effect, even if each error considered separately, would be harmless. *Chamberlain v. State*, 998 S.W.2d 230, 238 (Tex. Crim. App. 1999). The mere existence of multiple errors, however, does not warrant reversal unless they operated in concert to undermine the fundamental fairness of the proceedings. *Estrada v. State*, 313 S.W.3d 274, 311 (Tex. Crim. App. 2010). Moreover, if an appellant's claims of error lack merit, then there is no possibility of cumulative error. *Gamboa v. State*, 296 S.W.3d 574, 585 (Tex. Crim. App. 2009). Appellant has not demonstrated any trial court error from which we could consider cumulative harm. We overrule appellant's sixth issue.

## VII. CONCLUSION

We affirm the trial court's judgment.

LETICIA HINOJOSA
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed the
27th day of December, 2018.

21